PORTAGE COUNTY (PREBLE v.). See Case No. 11,380.
PORTE (UNITED STATES v.). See Case No. 16,070.

## Case No. 11,285.

### The PORTER.

[2 Dill. 146.] [1]

Circuit Court, E. D. Missouri. 1873.

ADMIRALTY—COLLISION—FOG SIGNALS.

1. A boat moored in the channel of the river near a large city, and at a place where vessels in making a landing would naturally come, was *held* to be in fault, because, during a heavy fog and snow storm, in which it was impossible to see but a short distance, it failed to give the usual fog signals.

2. The duty of vessels navigating the river during a heavy fog and snow storm, as respects speed, signals, &c. considered.

This is an appeal in admiralty, from a decree of the district court for the Eastern district of Missouri, dismissing the libel. [Case unreported.] The libellants are the owners of the steamboat Southern Belle, and filed in the district court a libel, which charged upon the steamboat Porter the fault of a collision which happened in the Mississippi river opposite the upper portion of the city of St. Louis, on the 19th day of October, 1869. The Grafton Stone and Transportation Company, as claimants, appeared and filed an answer admitting the collision, but denying the faults imputed to the Porter, and asserting that the accident was caused wholly by the fault of the vessel of the libellants.

M. L. Gray, for libellants.
Rankin & Hayden, for respondent.

DILLON, Circuit Judge. I have carefully gone over the pleadings and the 680 pages of testimony in this cause, and am of opinion that the decree pronounced below is correct. The material facts may be briefly stated: The libellants are the owners of the steamer Southern Belle and her barge, the Gertrude; the claimants are the owners of the steamer Porter and her barges. The collision occurred about 10 o'clock in the day time on the 19th day of October, 1869, in the Mississippi river, near the upper portion of the city of St. Louis, at a point in the river nearly opposite the block between Bogy and Le Beaume streets. The libel-

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

lants' vessel. the Southern Belle and her barge Gertrude, at the time of the collision were lying near the middle of the river, and were anchored there in the manner presently to be stated. The Southern Belle is what is termed a "sand-boat," that is, she was engaged at the time in elevating sand from the bottom of the river by means of machinery adapted to that purpose. The sand is dredged from the bar or bottom of the stream, and is brought up in buckets on an endless chain, something like the mode of elevating flour in mills, and deposited in the barge. The machinery is located on the steamer, and is propelled by steam. On the morning in question the Southern Belle, with her barge beside her, was lying near the middle of the river, but perhaps somewhat nearer to the Missouri than the Illinois shore. The river at this point is about a mile wide. The Southern Belle was headed up stream, and was kept stationary by being pinioned by four pieces of timber (two at the bow and two at the stern) driven down through the hull into the bottom of the river. At the same time the steamer Kate Hart, which is also a sand boat similar to the Southern Belle, with her barge attached, was also lying in the river, nearly abreast the libellants' vessel, and about one hundred to one hundred and fifty feet further toward the Illinois shore. Both boats were engaged in elevating sand. The barge of each boat was on the east side, that is, on the Illinois side of the respective steamers.

The steamer Porter was used by the claimants as a tow-boat, that is, to tow barges laden with stone obtained at Grafton, in Illinois, some miles above St. Louis. At the time of the collision the Porter had in tow five barges or boats filled with stone, intended for the bridge which was being built across the river at St. Louis. Two of these barges were on either side of the Porter and the other nearly in front, and with these the Porter was descending the river bound for St. Louis. She had left Grafton early in the morning of the day on which the accident happened.

On the same morning, probably about seven o'clock, the Southern Belle and the Kate Hart left their landings at St. Louis, and went out into the river for sand, and had been at the place above described elevating sand about two hours when the collision, which is the subject of inquiry here, occurred. The water where the Southern Belle was anchored was eleven feet deep, and it was no shallower at any place in the vicinity. At this place, in low water, there is what is termed a sand bar, or a deposit of sand in the bottom of the stream, making the water shallower than it is on either side of it. The river at the time of the accident was in a good stage, there being at least eleven feet of water over what is termed this bar, and a much greater depth on either side of it, and above and below it. There was noth-

ing to prevent vessels running in any part of the stream, as there were no obstructions in the river, and the water was sufficiently deep. The Porter drew less than four, and the largest barge did not draw to exceed five feet. At the place where the Southern Belle was stationed when she was injured, the water was deep enough to float any boat navigating the Missouri or Upper Mississippi, and it was near the place where boats descending the Illinois shore and intending to make a landing in the upper part of the city of St. Louis would naturally, and in fact, often did come. The Southern Belle and the Hart had been engaged in getting sand from the same bar, as it is termed, for some time, quite constantly during the whole month of October, making one and sometimes two trips a day, each trip occupying two or three hours. They did not, however, take the sand from precisely the same place each time, but from the same neighborhood, being guided on each trip by the soundings, they seeking of course the shallowest water. So during the same time, the Porter was making almost daily trips to Grafton for stone, usually going up on the Missouri side of the middle of the stream, and descending on the Illinois side some hundreds of feet east of where the sand boats were accustomed to be stationed, and in a general way, the business in which these boats were engaged was known to the officers on board of the other.

On the day in question it had been snowing lightly and had been a little foggy all the morning, but not so much that those on board of the boats could not see the banks of the river one-third to one-half mile distant, until about the time of the accident. When the Porter on her way down had reached Venice Ferry, or a short distance below, the snow seemed suddenly to have increased in severity, and the air became so thick that the officers on the Porter could not see the banks on either side, or a distance exceeding fifty or one hundred yards. The testimony establishes the fact that thereupon the pilot rang the slow bells, that the speed of the boat was checked, and that she proceeded on her course at a rate of speed but little faster than the current of the river (which is about four or five miles per hour), and only fast enough to give her steerage way or to keep control of her movements. During this time also, the Porter gave the usual fog signals every two minutes or oftener. One of these signals was heard and answered by a ferryboat in the river at the time, but none of these signals seem to have been heard on either the Belle or the Hart. And it is argued, and I must say, with much force, that the reason why these signals were not heard by those on board of the sand boats was, that the noise made by the working of the chains and machinery used in raising the sand, prevented it. It is an undisputed fact that no fog sig-

nals whatever were given either by the Belle or the Hart.

While the Porter was proceeding under slow bells and making the fog signals in the manner above described, the pilot signalled the engineer to land, and thereupon the boat commenced to turn quartering across the stream towards the Missouri shore. She had not gone far in this direction before the pilot and others on board of the Porter saw the Southern Belle not more than one hundred yards distant, whereupon the pilot gave the signal to stop and back strong, which was done, but this did not avail to prevent a collision with the Belle and her barge, doing them damage claimed to amount to several thousand dollars. Those on board of the Southern Belle did not perceive the Porter until she was within fifty or one hundred yards of them. And the question is, whether the Porter is to blame for the accident, and ought to pay the damage sustained by the libellants, or share the damages with them. And I observe, first, that the fault of the Belle in not giving any signals is, under the circumstances, most palpable. She was lying stationary and helpless in the middle of the river, or near the middle, opposite a large city. She was where boats had a right to be, and in the neighborhood where they were constantly coming and going. She was firmly fastened there, so that she could do nothing to avoid a collision should one be about to occur. The evidence shows that it required nearly a half hour to unfasten the boat thus pinned down, and get her in motion. She was in eleven feet of water, more than twice as much as steamers ordinarily need. I need not go so far as to say she was in fault for being there: but that she was in fault when surrounded by the noise of her machinery, and when enveloped in fog and snow, for not giving any warning of her presence or location. Who can say that if she had given the usual fog signals, that the injury of which she complains would have happened? Being thus in fault, the burden of proving an actionable or culpable fault in the Porter is clearly devolved upon the libellants.

The libellants insist on the testimony of the Porter's own officers, that the snow and fog were so thick that they could not see the banks, nor see a distance exceeding fifty or one hundred yards in advance; that the Porter ought to have landed, and that she is to blame for proceeding under such circumstances towards the harbor of the city. There would be more ground for the objection, if the testimony did not establish that the character of the banks on each side was such that a landing could not be safely effected, or would be attended with so much peril, as to make it unreasonable to require it as a duty which, under the circumstances, devolved upon the respondent. There is no proof that the upper portion of the landing or levee of the city, where the Porter design-

ed to land, was so crowded with vessels, or the river in that vicinity so filled with them, as to make the course adopted by the Porter one of any considerable peril to herself or others.

The libellants complain, also, that the Porter was in fault because, "although a snow-storm was then prevailing, the Southern Belle could easily have been seen from the Porter, if the latter had kept a good lookout, at least five hundred yards, and in time to have enabled her to avoid collision." The testimony shows that neither boat was actually seen by persons on the other, until they were within about one hundred yards apart, and tends very strongly to show that just at that time it was quite impossible to see them at any greater distance. There were no lookouts on either the Porter or the Belle such as the law requires.

But the captain, the pilot, and the mate of the Porter were outside, or at their respective posts on duty, and the mate testifies that at and before the collision he was specially engaged in looking ahead and listening to hear the sound of other boats; and it seems quite clear from the evidence that the absence of a special lookout was of no consequence. Certain it is, that in respect to lookouts, the Belle appears to have been more at fault than the Porter, and the officers of the latter saw the Belle a little before her officers saw the Porter. On the whole, it seems reasonably clear that no omission of duty on the part of the Porter with respect to lookouts, either caused or contributed to the injury. The Belle was seen as soon as in the storm and fog she could have been, and she had given no signal, and so none could have been heard, had there been ever so many lookouts on duty listening for them.

The libellants also complain that the Porter is in fault because she knew, or had reason to believe, that these sand-boats would be stationed thereon, or near the bar, and that she could or ought to have avoided them by keeping in the usual track of boats, some hundreds of feet east. The so-called bar (being in or near the middle of the river, and covered by at least eleven feet of water) is, at the then stage of the river, a misnomer. All vessels had a right, using due care to avoid injury to boats moored or anchored there, to pass along that portion of the river, and are not in fault merely for doing so. But in the storm then prevailing, the Porter did not know precisely where she herself was, nor could she know that the sand-boats would be in the course she had taken to make a landing at the city.

If the Porter had known that the sand-boats were there, or if she had reason to believe that they were there, and if she had control of her own movements and course, and unnecessarily put them in peril, the case would be very different from the one presented by this record.

The complaint that the Porter was carry-

ing a heavier tow that she was capable of managing, and the other complaint that she was running at an improper rate of speed, are both negatived by the evidence, which, on those subjects, is substantially all one way.

Nor is there any ground to claim that the mismanagement of the Porter and her tow, after the Belle was discovered, either caused the collision or increased the extent of the damages. She at once reversed her engine and commenced to back, and if she had been handled differently, it is not improbable that she might have swung around and injured or sunk the Kate Hart, which was lying within one hundred or one hundred and fifty feet of the Southern Belle.

Nor can it be claimed on the proofs that the Porter was in fault for not anchoring in the stream until the storm was over and her way was plain. She was going under slow bells, giving signals, and hearing none she had a right to suppose that there was nothing in danger from her movements, and the river is not so crowded with boats as under the circumstances to have made it the duty of the Porter to have subjected herself to the peril of attempting to anchor, even if it were practicable.

The decree below is affirmed. Affirmed.

NOTE. Bearing upon and supporting the decision in this case, see Strout v. Foster (The Louisville) 1 How. [42 U. S.] 89; The New York v. Rea, 18 How. [59 U. S.] 223; Culbertson v. Shaw (The Southern Belle) Id. 584; The Indiana [Case No. 7,020]; The Northern Indiana [Id. 10,320]; The Bay State [Id. 1,148], on appeal, 18 How. [59 U. S.] 89; The Scioto [Case No. 12,508]; Bazin v. Steamship Co. [Id. 1,152]; The Rocket [Id. 11,975].